UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

NORTHERN DIVISION



FILED

DEC 2 7 2007

CLERK

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

| | | |
|---|---|---|
| AMERICAN PRAIRIE CONSTRUCTION CO., formerly known as North Central Construction, Inc., | \* \* \* \* | CIV 04-1016 **2007 D.S.D. 29** |
| Plaintiff, | \* \* | |
| -vs- | \* \* | OPINION AND ORDER |
| TRI-STATE FINANCIAL, LLC, and JOHN HOICH, | \* \* \* | |
| Defendants. | \* \* | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**KORNMANN, U.S. DISTRICT JUDGE**

[¶1]     Plaintiff instituted this action for the alleged breach of a contract negotiated during the course of bankruptcy proceedings involving Tri-State Ethanol Company of Rosholt, South Dakota ("TSE"). The matter came on for trial to the court on August 1, 2007. The following constitutes the court's findings of fact and conclusions of law pursuant to Fed. R. Civ. P. 52.

[¶2]     North Central Construction Co. ("NCC") entered into a contract with TSE to build an ethanol plant in Rosholt, South Dakota. NCC is now known as American Prairie Construction Co. by virtue of a sale and acquisition of stock. The plaintiff will nevertheless be referred to as NCC.

[¶3]     NCC was also an equity investor in the plant, having contributed $1 million.

[¶4]     Additional investors in the plant included a group known as the "Omaha group." Defendant John Hoich ("Hoich") was a member of the "Omaha group" who personally provided at least $200,000 of equity funds to build the plant.

[¶5]     Radio Engineering Industries ("REI"), also a member of the "Omaha group," invested at least $200,000 in TSE. David Ruback ("Ruback"), the president of REI, was responsible for that investment. Ruback was on the board of directors of TSE.

[¶6]    The ethanol plant began operations in 2002 but was not profitable.  A decision was made to retrofit the plant to make it profitable.

[¶7]    NCC had not been paid and filed mechanic's liens against the property.  On December 31, 2002, NCC filed an action in Roberts County, South Dakota, to foreclose the mechanic's liens.  NCC moved to compel arbitration pursuant to the construction contract.  TSE resisted and filed a motion to stay arbitration which was granted.  NCC appealed and its appeal and lien foreclosure actions were stayed by the subsequent filing of a bankruptcy petition by TSE.

[¶8]    On December 31, 2002, while the plant was shut down for repairs and scheduled revisions, an explosion occurred at the plant.

[¶9]    TSE filed a Chapter 11 bankruptcy petition on May 23, 2003, No. 03-10194.  TSE did not list NCC as a secured creditor on its schedules but instead listed NCC as an unsecured nonpriority claim in the amount of $1,712,253 for construction costs.

[¶10]   In June of 2003, the "Omaha group" assigned their pre-petition equity interests in TSE to a company known as Tri-State Financial, LLC ("TSF").  The members of the LLC include Hoich who owned 8% of the LLC.  REI also invested $200,000 in TSF.  Between 2004 and 2006, REI had invested between $800,000 and $1 million in TSF.  Ruback was one of the five managers of TSF.

[¶11]   TSF was formed to provide a vehicle to loan funds to TSE for use in re-engineering and reconstruction of the plant.  This information was communicated to the creditors, including NCC, by virtue of a disclosure statement filed along with a plan of reorganization on December 31, 2003.

[¶12]   On July 14, 2003, NCC filed an adversary action in the bankruptcy court to determine the validity, priority, and extent of its liens (Adversary No. 03-1032).  NCC claimed unpaid construction fees in the amount of $3,611,883 against the bankruptcy estate, which claim NCC contends is a priority secured claim by virtue of a statutory mechanic's lien which attached as of October 12, 2000, such being the date the first item of labor or materials was furnished by NCC.  It is a well known principle of law that a mechanic's lien, even though filed later, attaches as of the date the contractor furnishes the first item of labor or materials.  TSE included NCC's $1,000,000 equity interest in its list of equity holders filed August 13, 2003.

2

[¶13]   On September 25, 2003, TSE filed a motion in the bankruptcy action, seeking approval of an agreement for post-petition financing whereby TSF would provide $2 million to make the plant a "20 million gallon" plant in exchange for its post-petition financing being considered a secured priority claim.

[¶14]   On October 22, 2003, the motion came on for hearing in Pierre, S.D.  Hoich testified at that hearing that TSF was only a "shell" corporation -- it had no source of funds other than from its investors.  Hoich testified that he was worth between $25 and $30 million and he could guarantee that funds would be available for TSF to invest in the plant.  He stated that there was no written agreement requiring him to make funds available to TSF other than his "swear oath."

[¶15]   Bankruptcy Judge Hoyt denied the motion on December 12, 2003.  Nonetheless, TSF did extend funds to TSE for the purposes proposed to Judge Hoyt and for day to day expenses.  This was done without Judge Hoyt's knowledge.

[¶16]   TSE filed a proposed plan for reorganization on December 31, 2003.  A modified plan was filed on March 2, 2004.  The modified plan provided for the payment of NCC's construction claim as a Class 12 unsecured non-priority claim to be paid over 10 years.  Its $1 million equity claim was classified by TSE as a Class 18 claim, which claims were to receive no distribution under the plan.  NCC filed an objection to the amended plan.  Murphy Brothers and Interstates Electric, a sub-contractor of NCC, also filed objections.

[¶17]   The United States Trustee filed a motion to dismiss the Chapter 11 case or convert it to a Chapter 7 case.

[¶18]   The motion to dismiss or convert and the plan confirmation hearing were scheduled for hearing by Judge Hoyt on June 21, 2004.

[¶19]   James Jandrain ("Jandrain") is a certified public accountant from Omaha who was an investor in TSE and was, in 2004, a manager of the plant.  The plant was not at that time operating.  He performed services for TSE although he was not the plant's accountant.  He helped prepare documents in conjunction with the bankruptcy, including some of the schedules as well as the financial information contained in the plan and amended plan.  He was also the treasurer of TSE and the personal CPA of Hoich.

3

[¶20]   On June 14, 2004, the Monday before the confirmation hearing, some members of the "Omaha group" met at NCC's offices in Fargo to discuss a settlement. Hoich, Ruback, Joe Vacanti and Ralph Brown, all on behalf of the "Omaha group," met with Peter Rudeen ("Rudeen"), the CEO of NCC, and Ace Brandt, the "owner" of NCC. This meeting was at "their" request, i.e., the "Omaha group." Jandrain, another of the investors in TSF, asked Hoich to negotiate with Rudeen for a settlement of NCC's claims against the bankruptcy estate and NCC's and Interstates Electric's objections to the Chapter 11 plan. Thomas Pokela, the then attorney for TSE, suggested to Jandrain that they negotiate to get NCC "out" so the plan could be approved. Hoich represented the "Omaha group" in the discussion of settlement dollars and terms. No agreement was reached that day.

[¶21]   TSF was the largest single equity owner of the equity in TSE. Jandrain was a member of that entity. He is presently on the board of managers for TSF but was not in 2004.

[¶22]   Jandrain, Randy Kramer, and "the farmer group" had originally guaranteed $600,000 of First Dakota Bank of Yankton's $9 million loan to TSE.

[¶23]   Jandrain filed a proof of claim which was a general unsecured claim for pre-petition services. His claim was denied by Judge Hoyt and by me on appeal.

[¶24]   Jandrain was one of the primary contacts between attorney Pokela and the debtor, TSE.

[¶25]   On June 18, 2004, attorney Jerrold Strasheim was admitted *pro hac vice* in the bankruptcy matter representing TSF. He had been retained as counsel for TSF approximately two weeks earlier. Strasheim's contact was Jandrain, although Jandrain was not a manager of TSF at that time.

[¶26]   On the Friday before the scheduled hearing, discussions again continued telephonically between Rudeen and Hoich.

[¶27]   Rudeen had a number of telephone conversations with Hoich on Friday, Saturday, and Sunday before the June 21, 2004, "Judge Hoyt settlement." Hoich also had conversations during such weekend with Jandrain and Ruback as to the amount of the offer. Jandrain and Hoich agreed to offer NCC $2.5 million. The $2.5 million figure was proposed by Hoich on Sunday night. Hoich told Rudeen he would raise $2.5 million to purchase NCC's position. Rudeen did not know whether the money was coming from TSF, from Hoich, or from Hoich and his friends.

4

Hoich told Rudeen he was attempting to raise the funds through a group of investors in Omaha, including himself, to pay the proposed settlement. Based on Hoich's previous testimony as to what he would do, Rudeen assumed Hoich was guaranteeing the payment of the money.

[¶28]   Rudeen talked to Hoich on the telephone on Monday morning, June 21, 2004, and accepted the $2.5 million offer.

[¶29]   Rudeen understood that Hoich was going to be present in bankruptcy court on June 21, 2004.   Rudeen spoke with Hoich that morning and Hoich stated that Jandrain and Ruback would be there to communicate to the other parties the agreement that Hoich and Rudeen had reached. Ruback was on the board of TSF and was "the decision maker" for TSF.

[¶30]   Present in Sioux Falls, South Dakota, at the settlement discussions which took place on the morning of June 21, 2004, prior to the confirmation hearing, were attorney Ron Hall and Rudeen on behalf of NCC, Strasheim on behalf of TSF, Jandrain, Daniel Hartnett on behalf of Interstates Electric, Thomas Pokela on behalf of TSE, and then U.S. Trustee Bruce Gering. Hoich was "present" over the telephone (he was in Omaha, Nebraska).   Ruback walked into that meeting two minutes before the meeting ended.

[¶31]   Rudeen understood that Jandrain, Strasheim, and Ruback were at the June 21, 2004, hearing on their own behalf and on behalf of TSF and were authorized to speak on its behalf and on behalf of Hoich.

[¶32]   As already discussed, Hoich told Rudeen that Jandrain would be at the hearing to confirm the agreement that Hoich and Rudeen had reached.   Therefore, Hoich told Rudeen that Jandrain would be his agent at the June 21, 2004, hearing as to the terms of the settlement agreement. Common sense tells us that Hoich, as the person who had negotiated the oral settlement, would be present at the court hearing, either in person or by an authorized agent.

[¶33]   At the hearing on the motion to dismiss or convert and on the confirmation of the proposed plan, Thomas Pokela, on behalf of TSE announced to Judge Hoyt that "we've reached an agreement with North Central Construction. Mr. Hall is going to read it into the record." Ron Hall stated:

> Your honor, this is an agreement for resolution of North Central's claims as well as or – and objections as well as Interstates Electric's objections and claims.  And the agreement is both with the debtor and with Tri-State

> Financial, LLC as well as John Hoich who – it's my understanding – has personally committed to this deal. and the deal is as follows:

The deal was, in essence:

> (1) NCC agreed to sell and TSF/Hoich agreed to purchase NCC's claim and equity interest (along with Interstate Electric's claim) for $2.5 million ($475,000 of which belongs to Interstate Electric).

> (2) TSF and Hoich, as purchasers of NCC and Interstate Electric's claims, will withdraw NCC's and Interstate Electric's objections to the proposed confirmation plan and will vote to accept a modified plan to be proposed by TSE.

> (3) Final settlement of all claims and will stipulate to dismissal of all NCC and Interstate Electric's claims in the bankruptcy proceeding, the adversary action, and the Roberts County foreclosure action, subject to court approval. This to include any claims TSE has against NCC.

> (4) As far as NCC and Interstates Electric are concerned, the court can confirm a modified plan to be submitted by TSE.

[¶34] Per the minutes of the hearing, TSE withdrew its plan and agreed to file a modified plan by June 25 to be followed by a confirmation hearing on July 27. All pending motions were continued, such to be heard along with the confirmation of the modified plan on July 27, 2004.

[¶35] Judge Hoyt in open court asked the attorneys "Is that your deal?" Mr Strasheim, after some difficulty identifying just who his client was, stated:

> "But that is the deal. We did mention in the room and I think that we're going to have a written agreement, I think those are certainly just almost a complete list of the terms. Bur we're going to have, for example, representations and warranties . . .

[¶36] Although Mr. Hall recited on the record that the deal included Hoich, Mr. Strasheim clearly stated:

> But I would finally say I do not represent Mr. Hoich. I believe that he is in this deal but I'm appearing here on behalf of Interstate Financial (he was confused as to the name of his client).

Mr. Hall further stated:

> I know that Mr. Strasheim does not represent John Hoich, but it is again our understanding that Mr. Hoich personally committed to this deal to the principals of North Central . . Mr. Jandrain is here to confirm that. Mr. Hoich for some reason didn't – you know, he's not here. But we think we have a deal with John Hoich as well.

6

Judge Hoyt inquired who was present to confirm that and Mr. Hall stated Mr. Jandrain. Mr. Strasheim then stated:

> Yeah, he – is he here in the room? Yeah, there he is. Your Honor, and I think it's my understanding Mr. Hoich has committed to this. I simply do not represent him and I would want to make that clear. We have no agreement to indemnify or hold harmless . . . we did not discuss and we have no deal about indemnification.

[¶37]   Jandrain had been present throughout the morning settlement conference and was sitting in court in the gallery during the hearing. He heard the colloquy concerning the settlement. He also had seen attorney Hall's notes as to the terms of the settlement. The notes are the same as the statements made by Hall on the record. Jandrain claims that he did not think he should interrupt court to state that he was not representing Hoich.

[¶38]   Both Hall on behalf of NCC and Strasheim on behalf of TSF told Judge Hoyt that Jandrain was present to confirm that Hoich was part of the agreement. Jandrain did not stand up and deny those statements. Jandrain wore many hats. He was at all times relevant the personal certified public accountant for Hoich. I take judicial notice of a book written by Hoich, "From the Ground Up." The book includes a picture of Jandrain in Hoich's airplane. The caption is "Jim Jandrain, John's CPA and friend on John's plane in 2005, returning from an ethanol meeting." Another picture shows a twin engine aircraft with this caption: "Jim Jandrain (John's CPA), John L. Hoich, and Doug Pugh (Real Estate Advisor) in front of John's plane (2006)." The book is published by Tapestry Press of Wyomissing, PA and can be found on the internet.

[¶39]   Counsel for TSF and Hoich, pursuant to a request from the Court,  supplied the business records of TSF. Relevant business records of TSF will be made a part of the file. If counsel wish to file other portions of the business records, they may do so. I have examined the records supplied.

[¶40]   On February 16, 2004, Hoich executed a form to be filed with the Nebraska Secretary of State as to a change in the registered agent for TSF. Hoich was the only signer of the document and signed as an "authorized representative." On October 20, 2004, a certificate of authority was executed by a person whose signature I cannot read. I believe the signer was Jandrain. The person was designated as a manager/member of TSF. The form shows that the initial managers were Ruback, Jandrain, Hoich and Theodore Hazer. A certificate of authority was also signed on

7

January 15, 2005, showing the same four managers of TSF.  On January 25, 2005, Hoich, by virtue of a signer holding a power of attorney from Hoich, signed a certificate of the managing members, stating that he was one of the managers of TSF.  The other managers listed are Ruback, Jandrain, Hazer, and Bernie Marquardt.

[¶41]   All of this is contrary to the testimony of Hoich at trial.  He testified that he did not really know the "past that much or the future."  He testified he "wasn't on the board or anything else."  He testified that he "was an investor like the other 18 guys."  These statements are simply not true as shown by the company records.  Again, under cross examination, he testified that he was "just an investor" and "just the messenger."  Again he testified: "I absolutely said I was an investor.  I never have been anything else but an investor."  Again, this testimony is simply not true.

[¶42]   Jandrain also testified that, on June 21, 2004, Hoich was not a member of the board of managers of TSF.  He also testified that, in effect, at all times material Ruback was the only manager.  This testimony is not true.

[¶43]   We also know that, based on the business records of TSF,  Jandrain was the holder of a proxy given by Hoich as to the interests of Hoich in TSF.  In other words, the proxy specifically authorized Jandrain to act as an agent for Hoich as to TSF affairs.

[¶44]   Strasheim claims to not having been aware of his client's settlement with NCC until minutes before the June 21, 2004, hearing.  This testimony is not credible.  It flies in the face of all reason to think that Hoich had concluded a settlement on behalf of TSF and did not tell the attorney for TSF what the terms were.  Strasheim, Jandrain, and Ruback were present at the pre-hearing meeting and heard Hall recite what the terms were.  If they were in doubt, would they not have contacted Hoich?

[¶45]   Hoich did testify that he told Jandrain before the June 21, 2004, hearing that NCC did not want the settlement to be contingent on approval of the bankruptcy plan.  Thus, Jandrain knew of the possible issue and said nothing when Hall spelled out the terms of the settlement at the pre-hearing conference and again in open court.

[¶46]   Strasheim was in court and was "his," i.e. Jandrain's, lawyer.  Jandrain did not approach Strasheim to cure any claimed misstatements.

[¶47]   Jandrain never himself expressly represented that Hoich was a guarantor of the purchase of NCC's claims.  It was stated that Hoich "was committed to the deal" which Jandrain interpreted to mean that he would try to raise the funds to purchase NCC's claims.

[¶48]   Hoich and Jandrain claim that Hoich never asked Jandrain to represent Hoich at the June 21, 2004, hearing.  They claim that Hoich never represented to Jandrain that Hoich wanted to be a party to the agreement.

[¶49]   Jandrain claims to have assumed the $2.5 million would be paid upon confirmation of an amended plan.  Any such assumption would fly in the face of Hall's notes and the statements by Hall to Judge Hoyt.

[¶50]   Strasheim testified that, under the agreement, no money would be paid unless a plan was confirmed.

[¶51]   Contrary to the testimony of Jandrain, Hoich testified that Rudeen did not want the settlement to be contingent on confirmation of the plan and Hoich told Jandrain the Rudeen did not agree to any contingency.  All parties were then in favor of confirmation and hoped that a plan would be confirmed.

[¶52]   The testimony by Jandrain and Strasheim makes no sense since Hall clearly stated in the pre-hearing meeting and again in open court that the settlement would be consummated before any plan was confirmed.  It was clear that NCC was to be paid and "out of the picture" before TSF stepped into the shoes of NCC by voting to approve the plan.  I give any testimony to the contrary no credence.

[¶53]   Ruback was present in the bankruptcy courtroom during the recorded hearing.  He understood that Hoich had negotiated with Rudeen to settle NCC's claims for $2.5 million.  After the hearing, Hoich explained to Ruback that Hoich was going to attempt to raise the money in order to accomplish the settlement.  TSF did not have $2.5 million at its disposal at that time. Ruback never heard any discussion prior to the June 21, 2004, hearing that any deal was subject to approval of the plan submitted by TSE.  However, according to Ruback, he had no doubt that confirmation of the plan was a condition of the settlement.  I give no credence to this testimony about such a condition of the settlement since it flies in the face of what was stated in open court before Judge Hoyt.

9

[¶54]   After the hearing, Ruback's company contributed $1.7 million to TSF towards the agreed settlement amount. A total of $2.5 million was indeed raised.

[¶55]   In a technical sense, the agreement was not a settlement agreement as it relates to TSF. It was a purchase agreement. TSF agreed to purchase any rights NCC had in the bankruptcy matter – the right to object or not object to a plan and the right to withdraw any claim that the estate owed NCC or the owner of that claim $4.5 million on a priority secured claim and $1 million on its equity claim. In return, NCC was compromising its claims for less than half of what NCC claimed was due it and agreed to dismiss its pending Roberts County lien foreclosure action. As owner of NCC's claims, TSF could vote to approve the Chapter 11 plan and could also dismiss NCC's adversary action. This agreement did not intend to extinguish NCC's claims but simply change who would assert (or not assert) the claims.

[¶56]   The agreement was not limited to TSF's purchase of NCC's claims, however. The agreement also contemplated that the bankruptcy estate would waive any claims against NCC for breach of warranty and negligence concerning the initial construction of the plant and the explosion that occurred during the retro-fit. In that respect, the agreement would have required the approval of the bankruptcy court.

[¶57]   After June 21, 2004, the parties exchanged drafts of proposed written agreements to memorialize the June 21, 2004, agreement. Those documents are irrelevant as to what the agreement was. It was contemplated that the agreement would be reduced to writing and it was reasonable for the parties to put in writing the various releases and transfer documents. However, these proposed written instruments cannot vary the essence of the agreement stated on the record in open court.

[¶58]   As contemplated, TSE filed a modified plan on June 25, 2004. The modified plan called for NCC's claim (which TSF owned under the settlement) to be a class 12 claim but it was to be paid in three years. The Class 18 equity interests (including NCC's $1 million equity interest which TSF owned under the settlement) were to retain their interests. TSF was to receive an additional equity interest for the $767,058 already contributed by TSF.

[¶59]   In late July of 2004, the TSF investors paid $2.5 million into the Baird Holm trust account to pay the settlement. According to Jandrain, the funds were to be paid out as soon as,

10

but not until, the new proposed plan was confirmed.  Jandrain contends that confirmation of a plan was an essential term.  I reject such testimony as not credible.

[¶60]   TSF contends that the agreement contemplated that the purchase of the claims would not be consummated until after Judge Hoyt confirmed the bankruptcy plan itself.  However, the clearly stated purpose of the purchase was to allow TSF the ability to withdraw the objections of NCC and Interstates to the plan.  TSF clearly agreed to pay for the assignment of claims before the confirmation hearing and Hoich personally guaranteed that TSF would do that.

[¶61]   TSF contends that, of the $2.5 million proposed settlement of NCC's claims, $1.5 million was to purchase NCC's claims against the bankruptcy estate and $1 million was to purchase NCC's equity interest in TSE.  TSF contends that the equity interest was worthless unless the plan was confirmed and, therefore, this is evidence that the agreement was contingent upon plan confirmation.  I reject such contentions.  On hindsight and further reflection, TSF and Hoich may have concluded that the agreement should be contingent upon plan approval but this maters not.

[¶62]   Jandrain testified that the equity interests were worthless in June and July of 2004.  The claims against the plant were approximately $19 million.  The plant, if it were running at the time, would have been worth approximately $25 million.  The plant was not running at the time but the plan submitted by TSE called for continuing retrofitting and getting it running by September 1, 2004.  It was therefore contemplated by TSF, who was financing the changes to the plant, that the plant would be up and running soon after plan confirmation.  The equity interests would eventually retain their value.

[¶63]   NCC filed a motion on July 14, 2004, asking Judge Hoyt to approve the compromise agreement reached on June 21, 2004.  TSE filed a response to the motion on July 16, 2004, stating that the motion did not accurately set forth the agreement reached and that, unless TSF and NCC "are able to reach an agreement," it would be difficult for TSE "to enter into the proposed agreement."  TSE was thus taking the position that it was a party to the agreement.  At that time, TSE was in bankruptcy and its claims (that NCC breached the construction contract and warranties) belonged to the Trustee and not TSE.  TSE as such was not a party to the agreement in question.

11

[¶64]   TSF filed its response on July 21, 2004, stating that the orally announced stipulation did not include all terms of the settlement "and in some aspects is unclear or incomplete, or both." TSF went on to request

> "that TSF not be bound by the description of the settlement in the Motion but be bound only by the stipulation made in court on June 21, 2004, and by the terms and conditions of the written agreement still in the process of being negotiated."

[¶65]   As of July 21, 2004, TSF still took the position that it was bound by the terms of the oral stipulation placed on the record one month earlier.

[¶66]   NCC tendered its assignment of claims against TSE and its interests in TSE on July 28, 2004, to Strasheim.  Hoich was not physically present but was "present" telephonically.  That assignment specifically acknowledged that the assignment of claims was conditioned upon both the receipt of $2.5 million and upon the bankruptcy court's approval of the agreement and release of the estate's claims against NCC.  The settlement was thus, as understood by NCC, at least in part contingent upon approval by the bankruptcy court.  There was no mention, however, that the global settlement was contingent upon court approval of a second modified plan.

[¶67]   The motion to confirm the modified plan and the motion to approve the compromise agreement came on for hearing on July 27, 2004.  Judge Hoyt stated at that hearing:

> Court has briefly discussed this with counsel in chambers, and Mr. Pokela just advised that you all were going to adjourn to conduct further negotiations as to reaching some sort of agreement because the, the simple matter is without – there's no motion to approve at this time by virtue of the fact that we don't – at this point anyway, by the parties admissions, we don't have an agreement . . . there is a question of whether we have an agreement.  So in essence at this point we don't – at this point by virtue of, of various interpretations have an agreement to approve . . . And I'm not going to reiterate myself as to what we talked about in chambers other than the fact that I am, I am confident that the record as it stands was not conditional in any manner, shape or form as, as to the settlement.

Mr. O'Halloran, on behalf of NCC, stated:

> I believe there was a settlement based on what was read into the record on June 21st . . . it wouldn't be accurate then to say there's no agreement, it would be accurate to say there's a breach.

Judge Hoyt responded:

> Well I, I guess – I, I don't disagree with you but the other thing you got to bear in mind that, that we only have jurisdiction over the debtor and, and not necessarily any deals with

12

the creditors sort of (sic) speak. I can't force Tri-State Financial to make a consummated deal . . . There, there's nothing I can do to put it together to an outside party, I don't have jurisdiction per se.

[¶68]   The next day, Judge Hoyt denied the motion to approve the settlement, declined confirmation of the plan and converted the matter to a Chapter 7. A Chapter 7 trustee was thereafter appointed.

[¶69]   On August 4, 2004, NCC filed the instant breach of contact action in federal district court.

[¶70]   On October 28, 2004, Judge Hoyt approved the sale of the assets of TSE to the high bidder, ABUS, LLC, for $28 million, to close on December 15, 2004.

[¶71]   ABUS did not close and on December 22, 2004, Judge Hoyt approved a sale to the second high bidder, TSF, for $27.9 million to close February 5, 2005.

[¶72]   The Trustee filed a motion in bankruptcy court for an order authorizing the disbursement of nearly $15 million of the sale proceeds to secured creditors – not including NCC. NCC objected.

[¶73]   On February 15, 2005, Judge Hoyt granted the Trustee's motion to disburse the proceeds and ordered the Trustee to place $5.8 million in an escrow account to protect NCC's claims.

[¶74]   TSF filed a claim against the bankruptcy estate in the amount of $1,983,654 for funds advanced post-petition pre-conversion to TSE. TSF requested that such funds be paid as a priority administrative expense. These funds had been advanced despite Judge Hoyt's earlier order denying the request of TSF that any funds advanced post-petition be considered a priority administrative expense.

[¶75]   On March 21, 2005, the Trustee filed an adversary complaint against TSF, seeking determination that the amounts requested in the proof of claims of TSF were "loans" and that "administrative expenses" advanced by TSF to TSE (post-petition pre-conversion) constituted additional equity interests and not debts and should be subordinated to all other claims (adversary No. 05-1006).

[¶76]   NCC filed a motion in bankruptcy court to authorize payment of its claim on April 13, 2005.

13

[¶77]  In May of 2005, the Trustee and TSF entered into a proposed settlement agreement of TSF's claimed administrative expenses and the Trustee's adversary action against TSF.  Of the $1.9 million claimed by TSF, $793,654 was to be allowed as an administrative expense and the remaining $1,190,000 was to be allowed as a timely filed general unsecured claim, subordinated to claims filed on or before January 24, 2005.

[¶78]  On June 10, 2005, TSF filed an adversary action in bankruptcy court against NCC, seeking a declaration that, due to NCC's fault in the failure of the ethanol plant, any allowed claim of NCC should be equitably subordinated to the claims of TSF (Adversary No. 05-1009).

[¶79]  On that same date, Judge Hoyt issued an order setting an evidentiary hearing for August 29, 2005, on NCC's motion to authorize payment of its claim and on the Trustee's objection to that proof of claim.

[¶80]  On July 26, 2005, United States Magistrate Judge John Simko attempted to mediate the issues set for the August 29, 2005, evidentiary hearing and on the issues in the adversary claim by TSF against NCC.  After hearing from the parties as to a settlement and the terms thereof, Judge Simko recited the terms on the record:

> (1) The Trustee would pay $2 million to NCC in complete satisfaction of NCC's claims in the bankruptcy estate.
>
> (2) The agreement was conditioned upon the approval of Judge Hoyt of all parts of the agreement.
>
> (3) No party to the settlement will object to the proposed approval of the settlement.
>
> (4) The $793,654 claim of TSF will be paid in full.  The TSF claim for $1,190,000 will move up to the class of unsubordinated general unsecured creditor claims.
>
> (5) The Trustee will assign to TSF all the bankruptcy estate's claims against Gaylor Engineering (the entity that provided engineering services in the construction of the plant) or any other third party relating to the plant.
>
> (6) TSF will indemnify NCC against any third party claim that Gaylor Engineering might file against NCC in the event TSF sues Gaylor.
>
> (7) The parties will give a mutual release of all claims.  NCC agreed to dismiss the lawsuit regarding breach of the Hoyt settlement agreement (the action now pending before me).

[¶81]  NCC filed a motion in bankruptcy court on November 21, 2005, to enforce the "Simko settlement."

14

[¶82]   TSF objected to enforcement of the claimed mediated settlement, claiming that Judge Hoyt had no jurisdiction to enforce the "Simko settlement" and that the recitation in the record was merely a series of "core agreements" not intended to be the total ultimate settlement agreement and that the "agreement" was too "imprecise" to enforce.  TSF seemed to be claiming that Judge Simko's court reporter had not correctly transcribed what was said.  This claim makes no sense.

[¶83]   The parties again engaged in mediation on December 8, 2005, but no agreement was reached.

[¶84]   Judge Hoyt held an evidentiary hearing on the motion to enforce the "Simko settlement" on February 9, 2006.

[¶85]   Judge Hoyt concluded that the "Simko settlement" was an enforceable contract.  This "conclusion" or "advisory opinion" is of no legal significance.

[¶86]   The Trustee filed a motion to approve the "Simko settlement."  That motion came on for hearing on May 4, 2006, and Judge Hoyt denied the motion on May 5, 2006, finding that the proposed "Simko settlement" was not in the best interests of the creditors.

[¶87]   The Trustee, on June 12, 2006, entered into a settlement with NCC as to NCC's claim against TSE for construction costs.  NCC had filed a proof of claim alleging that, as of December 15, 2004, the secured claim (which by now included substantial interest) had a value of $4,154,616.  The terms of the settlement were that the Trustee would pay $2 million to NCC. NCC agreed to release all claims pending in the bankruptcy proceeding, with the exception of its $1 million equity claim, and to dismiss its state court lien foreclosure action, and the appeal from the denial of NCC's motion to compel arbitration.  All claims in the bankruptcy proceeding against NCC were to be released except the adversary claim filed by TSF alleging that NCC's claims should be equitably subordinated due to NCC's alleged liability arising out of the December 31, 2002 explosion (Adversary No. 05-1009).  The release of claims did not include any release of NCC from liability to National Farmers Union Property and Casualty Company in its subrogation action pending in district court.  The Trustee thereafter filed a motion to approve such settlement.

[¶88]   On June 14, 2006, Judge Hoyt entered an order approving the Trustee's May 1, 2005, motion to approve the settlement between TSF and the Trustee.

[¶89]   On June 19, 2007, Judge Hoyt entered an order approving the Trustee's motion to approve the $2 million settlement with NCC.  However, whether NCC's $2 million claim may still be equitably subordinated (as asserted by TSF) was to be addressed within Adversary No. 05-1009.  TSF appealed to the District Court the order of Judge Hoyt in approving the settlement between the Trustee and NCC.  That appeal is pending before me.

[¶90]   Whether NCC is entitled to $2,000,000 or $2,500,000 or nothing, it would seem that NCC is not entitled to be paid $2,000,000 twice.  Yet if I were to affirm what Judge Hoyt approved as between the Trustee and NCC and, in addition, hold TSF or Hoich or both liable in this action, that could be a possible result.  I raised the question during the trial of this case whether TSF was not "shooting itself in the foot" by objecting to the NCC-Trustee settlement and not asking for a credit against anything that might be recovered by NCC in the action in District Court.  TSF has different lawyers as to the breach of contract claim as distinguished from the pending appeals from bankruptcy court.  Counsel could not answer my question and neither can I.  TSF is riding two horses in different directions.

[¶91]   "The law favors the compromise and settlement of disputed claims." Kroupa v. Kroupa, 574 NW2d 208, 212 (S.D. 1998) (*quoting* Johnson v. Norfolk, 82 NW2d 656, 660 (S.D. 1957)).  In fact, this general principle has been recognized for well over 100 years.  *See* Williams v. First Nat'l Bank, 216 U.S. 582, 595, 30 S.Ct. 441, 445, 54 L.Ed. 625 (1910) (*citing* Hennessy v. Bacon, 137 U.S. 78, 11 S.Ct. 17, 34 L.Ed. 605 (1890)).  This principle is founded on the desire favoring amicable resolution of disputes and avoiding costly, time-consuming trials.  *See generally* Erickson v. Webber, 237 NW 558 (S.D. 1931).

[¶92]   Trial courts possess inherent or equitable power to summarily enforce agreements to settle pending cases.  Gardiner v. A.H. Robins Co., Inc., 747 F.2d 1180, 1190 (8th Cir. 1984).  However, trial courts may enforce only completed settlement agreements.  *Id.* at 1189.  The party requesting enforcement of a settlement agreement has the burden of proving its claim for relief by clear, convincing, and satisfactory evidence.  Kenner v. City of Richmond Heights, Mo., 356 F.Supp.2d 1002, 1007-08 (E.D.Mo. 2005), aff'd, 196 Fed. Appx. 450 (8th Cir. 2006).

[¶93]   The basic principles of contract formation govern the existence and enforcement of an alleged settlement.  *See* In re Airline Ticket Comm'n Antitrust Litig., 268 F.3d 619, 623 (8th Cir. 2001), and Sheng v. Starkey Labs., 53 F.3d 192, 194 (8th Cir. 1995).

[¶94]   "To form a contract, there must be a meeting of the minds or mutual assent on all essential terms." Jacobson v. Gulbransen, 2001 SD 33, ¶ 22, 623 NW2d 84, 90.  The parties must have reached agreement on the essential terms of the deal, in order for a settlement agreement to be enforceable.  Sheng v. Starkey Laboratories, Inc., 117 F.3d 1081, 1083 (8th Cir. 1997) (appeal after remand).  "Mutual assent refers to a meeting of the minds on a specific subject" and "does not exist 'unless the parties all agree upon the same thing in the same sense.'" Read v. McKennan Hosp., 2000 SD 66, ¶ 25, 610 NW2d 782, 786 (*quoting* SDCL 53-3-3).  To determine whether there was mutual assent, "the court looks at the words and conduct of the parties." Jacobson, 2001 SD 33, ¶ 22, 623 NW2d at 90; Stewart v. Prof'l Computer Ctrs., Inc., 148 F.3d 937, 939 (8th Cir. 1998) (binding settlement agreement requires objective manifestation of mutual assent, which may be inferred from external indications reflecting thoughts and intentions of parties)).  Whether the parties had a meeting of the minds is a question of fact.  *Id.*

[¶95]   Mutual mistakes in making a compromise will not necessarily vitiate a settlement agreement.  Fada v. Information Sys. & Networks Corp., 649 N.E.2d 904, 908 (Ohio App. 3d 1994).

[¶96]   There is no requirement that the agreement be reduced to writing.  Leon Industries, Inc. v. I.C.N. Pharmaceuticals, 472 F.Supp. 1241, 1242 (E.D.Mo. 1979) (*citing* Kukla v. National Distillers Products Company, 483 F.2d 619 (6th Cir. 1973)).  The agreement must be sufficiently definite to enable a court to give it an exact meaning.  Deadwood Lodge No. 508 Benev. and Protective Order of Elks of U.S. of America v. Albert, 319 NW2d 823 (S.D. 1982).  "Minor points implementing the agreement, though not listed, can be implied as necessary to carry out the terms of the agreement." Gardiner, 747 F.2d at 1190 (*quoting* In re Estate of Eberle, 505 NW2d 767, 770 (S.D. 1993).  Further, if the parties have left some details for counsel to work out through further negotiation, a legal, valid settlement agreement still exists.  Sheng, 117 F.3d at 1083.  In other words, "the fact that the parties left insubstantial matters for later negotiation . . . 'does not vitiate the validity of the agreement reached.' " Trnka v. Elanco Products Co., 709

17

F.2d 1223, 122 fn.2 (8th Cir. 1983) (*quoting* Bergstrom v. Sears, Roebuck & Co., 532 F.Supp. 923, 932 (D.Minn.1982)).  Even mutual mistakes in making a compromise will not necessarily vitiate a settlement agreement.  Kroupa,574 NW2d at 214 (*citing* Fada v. Information Sys. & Networks Corp., 649 N.E.2d 904, 908 (Ohio App. 3d 1994)).  In short, once parties have settled a dispute and have agreed to settlement terms, the parties cannot rescind it.  Caleshu v. Merrill Lynch, 737 F.Supp. 1070, 1086 (E.D.Mo. 1990).

[¶97]   "Settlements made in open court are generally binding, especially when entered on the record."  Kroupa, 574 NW2d at 214 (*citing* In re Estate of Eberle, 505 NW2d 767, 770 (S.D. 1993)).  So long as there is a clear offer and acceptance of the compromise and a meeting of the minds on the essential terms of the agreement, oral settlement agreements made in the presence of the trial court are enforceable as binding contracts.  Eberle, 505 NW2d at 770.  Once counsel agree on the necessary terms for a binding settlement in court, "a contract is formed even though they intend to adopt a formal document with additional terms at a later date."  Kroupa, 574 NW2d at 214 (*citing* Capek v. Mendelson, 821 F.Supp. 351, 357 (E.D.Pa. 1993)).

[¶98]   Even when parties change their minds between the time of oral agreement in court and when it is to be reduced to writing, the settlement is nonetheless binding.  Gross v. Penn Mut. Life Ins. Co., 396 F.Supp. 373, 375 (D.C.Pa. 1975).  Parties to a voluntary settlement agreement cannot avoid the agreement simply because the agreement ultimately proves to be disadvantageous.  Trnka, 709 F.2d at 1227.  Voluntary settlements and stipulations "entered into cannot be repudiated by either party and will be summarily enforced . . ."  Cummins Diesel Michigan, Inc. v. The Falcon, 305 F.2d 721, 723 (7th Cir. 1962); *see also* Schneider v. Dumbarton Developers, Inc., 767 F.2d 1007, 1015 (D.C. Cir. 1985).

[¶99]   "In order to determine whether the parties intended to be bound by the settlement prior to the execution of the written documents, a court must consider the course of negotiations, agreement on material terms, whether the parties described the settlement as such, and whether any existing disagreements were merely technicalities."  Caleshu, 737 F.Supp. at 1086 (*quoting* Leon Industries, 472 F.Supp. at 1242); Worthy v. McKesson Corp., 756 F.2d 1370, 1371-73 (8th Cir. 1985) (per curiam) (oral settlement reached prior to preparation of formal settlement documents is enforceable).

[¶100] "A litigant who enters the judicial process through the agency of freely chosen counsel always assumes a certain risk that the result achieved will not be satisfactory." Kroupa, 574 NW2d at 216. "While an attorney's authority to settle must be expressly conferred, the existence of the attorney of record's authority to settle in open court is presumed unless rebutted by affirmative evidence that authority is lacking." Kroupa, 574 NW2d at 214 (*quoting* Szymkowski v. Szymkowski, 432 N.E.2d 1209, 1211 (Ill. App. 3d 1982)). Clients are held accountable for acts and omissions of their attorneys. Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. Partnership, 507 U.S. 380, 396, 113 S.Ct. 1489, 1499, 123 L.Ed.2d 74 (1993).

[¶101] The rules for determining whether settlement authority has been given by the client to the attorney are the same as those which govern other principal-agent relationships. Turner v. Burlington Northern R. Co., 771 F.2d 341, 345 (8th Cir. 1985); Melstad v. Kovac, 723 NW2d 699, 704 (S.D. 2006). The party who denies that the attorney was authorized to enter into the settlement has a heavy burden to prove that authorization was not given. Turner v. Burlington Northern R. Co., 771 F.2d 341, 346 (8th Cir. 1985), and Harris v. Arkansas State Highway and Transp. Dept., 437 F.3d 749, 750-751 (8th Cir. 2006). Also, a client's failure to object timely to his or her attorney's action taken without the client's consent may be deemed to be acquiesced by the client. *See* Restatement (Second) of Agency § 94 (1958).

[¶102] TSF entered into a binding agreement with NCC on June 21, 2004. TSF agreed to purchase NCC's claims against the bankruptcy estate for $2.5 million. The parties agreed to the terms stated on the record in open court before Judge Hoyt and that agreement should be and is enforceable.

[¶103] Hoich, on behalf of TSF, negotiated the June 21, 2004, agreement with NCC's CEO. TSF, on the bankruptcy record, admitted that it was a shell corporation with no assets of its own to pay any settlement. Hoich had, under oath, previously testified that he himself would make sure that cash would be available to TSF to pay its obligations. Rudeen and NCC reasonably believed that Hoich would also guarantee the payment of the settlement proceeds. That agreement was stated on the record in the presence of Jandrain after Hoich had told Rudeen that Jandrain would be present at that hearing on Hoich's behalf to confirm the settlement. Without Hoich's participation, no settlement was possible, given the fact that TSF was an entity with no

19

assets and no ability to pay anything.  Common sense alone tells us that NCC would not have agreed to a settlement without Hoich's personal financial commitment.  We know that TSF itself put nothing into the law firm's trust account.  The $2.5 million came from individual investors.

[¶104] Hoich is liable as a principal in the settlement agreement only if plaintiff can show that Jandrain had ostensible (apparent) authority to bind Hoich on the record.  Clearly, Hoich negotiated the settlement agreement.  Assuming Hoich agreed to be personally bound, he could not be bound by that oral agreement unless that agreement was reduced to writing or, as in this case, was read into the record before Judge Hoyt.  Rudeen testified on direct examination that he was told the morning of June 21, 2004, that Hoich would not be present but that Jandrain and Ruback would appear on his behalf.  That is exactly what happened.

[¶105] Under South Dakota law, an ostensible agency exists

> when by conduct or want of ordinary care the principal causes a third
> person to believe another, who is not actually appointed, to be his agent.

SDCL 59-1-5.  "Ostensible agency exists where the law implies an agency relationship because the principal affirmatively, intentionally, or by lack of ordinary care causes a third party to believe another is serving as his agent."  Dahl v. Sittner, 429 NW2d 458, 462 (SD1988).   For the purposes of the June 21, 2004, settlement, Jandrain was Hoich's ostensible agent.

> Ostensible authority is such as a principal intentionally, or by want of
> ordinary care, causes or allows a third person to believe the agent to
> possess.

SDCL 59-3-3.  Hoich caused and allowed Rudeen to believe that Jandrain had the authority to bind Hoich at the June 21, 2004, hearing.  Hoich was himself a principal obligor in the agreement to purchase NCC's claims against the TSE bankruptcy estate by virtue of his acts and the acts of his ostensible or actual agent, Jandrain.

[¶106] Under South Dakota law,  "a 'guarantor' is one who agrees to answer for the debt of a third person."  Cargill, Inc. v. American Pork Producers, Inc., 426 F.Supp. 499, 510 (D.S.D. 1977).

> A promise to answer for the obligation of another is deemed an original
> obligation of the promiser (sic) and need not be in writing where the
> creditor parts with value or enters into an obligation, in consideration of
> the obligation in respect to which the promise is made, in terms or under

20

> circumstances such as to render the party making the promise the principal debtor, and the person in whose behalf it is made his surety.

SDCL 56-1-6.

[¶107] Hoich made a personal financial commitment to guarantee the payment of the settlement proceeds. That commitment was reduced to writing when it was read into the record. Even if not entered into the record, NCC agreed to part with the value of its claims, and did tender its claims, under circumstances such as to render Hoich a guarantor. Rudeen, on behalf of NCC, would not have entered into the purchase agreement unless Hoich personally guaranteed payment and Hoich did so guarantee to induce Rudeen to accept $2.5 million in exchange for claims which NCC then asserted exceeded $4.6 million. Rudeen accepted the guarantee and it was then binding. *See* SDCL 56-1-10. Hoich did not place any condition precedent upon his guarantee (*see* SDCL 56-1-15), and he was therefore liable to NCC upon TSF's default on July 28, 2004 (the date NCC tendered its assignment of claims and interests in TSE personally to Strasheim). *See* SDCL 56-1-16.

[¶108] TSF contends that the June 21, 2004, settlement agreement was subject to a condition precedent. A condition precedent "is a limitation on the contractual obligations of the parties. A condition precedent is a fact or event which the parties intend must exist or take place before there is a right to performance . . . If the condition is not fulfilled, the right to enforce the contract does not come into existence." Johnson v. Coss, 2003 SD 86, ¶ 13, 667 NW2d 701, 705-06. "[C]onditions precedent are not favored by courts." Weitzel v. Sioux Vallley Heart Partners, 2006 SD 45, ¶ 38, 714 NW2d 884, 895. "In the absence of plain, unambiguous language or necessary implication, courts generally will interpret conditions as stipulations rather than conditions precedent that could trigger forfeiture." *Id.*

[¶109] The agreement included a provision that it was subject to court approval. It is ambiguous whether court approval was required of all parts or just the dismissal of the various court cases. A requirement of court approval is therefore not an enforceable condition precedent.

[¶110] "Generally, a contract will be unenforceable when it contains a condition precedent that fails to occur." Weitzel v. Sioux Valley Heart Partners, 2006 SD 45, ¶ 39, 714 NW2d at 896. "Under the prevention doctrine, when a party to the contract hinders the occurrence of a

condition precedent, that condition is waived." *Id*. "Whether interference by one party to a contract amounts to prevention so as to excuse performance by the other party and constitute (sic) a breach by the interfering party is a question of fact to be decided by the jury under all of the proved facts and circumstances." *Id*.

[¶111] Even if court approval of the settlement had been a condition precedent, TSF and Hoich waived that condition because, when they refused to be bound by the agreement and objected to any approval, they hindered and blocked court approval.

[¶112] Court approval of the TSE proposed Chapter 11 plan was not a condition precedent to the enforcement of the contract. In fact, it was not part of any agreement contemplated by Hoich and NCC. All parties contemplated exactly the opposite.

[¶113] It is important to note that John Hoich is not a babe in the woods. He is a very intelligent and enormously successful business person. I take note of not only what I observed in the courtroom during his testimony but also what he reports in the book he authored and caused to be published. He has sold a shopping mall that he owned. He explains how to sell a million dollar business. He is a friend of more than one President of the United States. He is a friend of Warren Buffet of Omaha, perhaps the most sophisticated business person in the world. He and TSF made the decision to have him go to negotiate with NCC, without a lawyer or an accountant accompanying him. He did negotiate a settlement. At no time did Hoich or any of the principals of NCC ever mention that the settlement was conditioned upon the bankruptcy court first approving the TSE Chapter 11 plan. In fact, the agreement was that the plan would not be approved until after the $2.5 million was paid to NCC. That is exactly what attorney Hall stated before Judge Hoyt in the presence of Jandrain, Ruback, and Strasheim. When Strasheim and Jandrain had time to further consider the matter (after the settlement had been agreed to in open court), they added the requirement of approval of the Chapter 11 plan before any money was to be paid. In other words, they turned the agreement 180 degrees from what had been said in court and from what had been agreed to by Hoich and NCC. Jandrain and Strasheim did not seek to add "details" or customary contractual provisions. They insisted that the terms of the agreement had to go in the opposite direction. This is not to be permitted. The fact that Jandrain,

22

Strasheim, and other investors in TSF did not, on further reflection, like the deal that Hoich had negotiated on their behalf is of no moment.

[¶114] Defendants did not raise the defense that the June 21, 2004, settlement was abandoned by plaintiff when it entered into a subsequent settlement agreement on the record before Judge Simko. They did not seek to raise such a defense even when I raised the question in open court.

[¶115] A duty may be discharged by the obligee's acceptance of either a performance or a contract in substitution for performance of that duty. If the parties intend the new contract to replace all of the provisions of the earlier contract, the contract is a substituted contract. The Restatement of the Law, Contracts (2d) § 279 (1981), defines a substituted contract as "a contract that is itself accepted by the obligee in satisfaction of the obligor's existing duty. Fusco v. Xerox Corp., 676 F.2d 332, 336 (8th Cir. 1982). The substituted contract discharges the original duty and breach of the substituted contract by the obligor does not give the obligee a right to enforce the original duty." *Id.*

[¶116] The doctrine of judicial estoppel applies where a party takes a legal position which is inconsistent with an earlier legal position, which earlier legal position was judicially accepted. Canyon Lake Park, LLC v. Loftus Dental, P.C., 2005 SD 82, ¶ 34, 700 NW2d 729. NCC took the legal position before Judge Hoyt that the "Simko settlement" was an enforceable settlement agreement. TSF took the opposite position, claiming there was no first settlement or second settlement.

[¶117] A novation is also a type of substituted contract. Section 280 states that: "[a] novation is a substituted contract that includes as a party one who was neither the obligor nor the obligee of the original duty." *Id.* In other words, the word "novation" as used in the Restatement refers to a type of substituted contract that has the effect of adding a party, either as obligor or obligee, who was not a party to the original duty. Restatement 2d Contracts § 280.

[¶118] South Dakota, unlike the Eighth Circuit, does not use the Restatement terminology. Instead, South Dakota uses novation as a catchall term for substituted contracts. In South Dakota, a "novation" is "the substitution by contract of a new obligation for an existing one and is subject to the rules concerning contracts in general." SDCL 20-7-5. A novation is made by

23

the substitution of a new obligation between the same parties, with intent to extinguish the old obligation. SDCL 20-7-6. A novation wholly extinguishes the earlier contract.

[¶119] Essential elements of novation are: (1) a previous valid obligation, (2) agreement of all parties to the substitution under a new contract based on sufficient consideration, (3) extinguishment of the old contract, and (4) the validity of the new contract. Haggar v. Olfert, 387 NW2d 45, 50 (S.D. 1986); Ducheneaux v. Miller, 488 NW2d 902, 911 (S.D. 1992). It is a well-settled principle that novation is never to be presumed. *Id.* "Novation is not effective unless there is an intention on the part of the parties to extinguish the old obligation by substituting the new one therefor." Hyde v. Hyde, 99 NW2d 788, 791, (SD 1959). The intention to substitute one contract for another so as to constitute a novation need not be expressed, but may be inferred from the circumstances. *Id.* The issue of novation presents questions of fact if there is any supporting evidence and the terms of the agreement are equivocal or uncertain.' *Id.* Clear and convincing evidence is required in order to justify setting a written contract aside and holding it abandoned or substituted by subsequent parol evidence or contract. Haggar, 387 N.W.2d at 50.

[¶120] Novation is an affirmative defense, First Dakota Nat. Bank v. Maxon, 534 NW2d 37, 45 (SD 1995), which must be plead in the answer, Fed. R. Civ. P. 8(c). The United States Court of Appeals for the Eighth Circuit has held:

> Generally, failure to plead an affirmative defense results in a waiver of that defense. The Supreme Court has indicated that the Rule 8(c) pleading requirement is intended to give the opposing party both notice of the affirmative defense and an opportunity to rebut it. We have, therefore, eschewed a literal interpretation of the Rule that places form over substance, and instead have held that "[w]hen an affirmative defense 'is raised in the trial court in a manner that does not result in unfair surprise . . . technical failure to comply with Rule 8(c) is not fatal.'"

First Union Nat. Bank v. Pictet Overseas Trust Corp., Ltd., 477 F.3d 616, 622 (8th Cir. 2007) (internal citations omitted).

[¶121] Novation was raised *sua sponte* by the Court prior to the presentation of evidence in this case. It was not raised previously. Neither party presented evidence as to whether the 2005

24

settlement possibly mediated by Judge Simko resulted in a novation of the 2004 settlement recited to Judge Hoyt. Any such issue is abandoned.

[¶122] I give the testimony of Jandrain and Strasheim virtually no credibility. Witnesses for NCC were credible. Hoich and TSF are liable as principals to NCC. In the alternative, Hoich is liable as a guarantor of the obligations of TSF. The essential terms of the contract have been proven and the parties are bound to them. There was mutual assent on all essential terms. TSF and Hoich breached the contract and NCC has been damaged. Hoich and TSF are jointly and severally liable to NCC in the amount of $2,500,000 plus prejudgment interest at the South Dakota statutory rate from June 21, 2004, until date of judgment, plus the costs and disbursements of plaintiff. No consequential damages should be awarded. There is no statute or rule of court or any agreement between the parties expressly authorizing taxing of attorneys fees and therefore NCC's request for such an item of expense is not allowable. International Multifoods Corp. v. Mardian, 379 NW2d 840, 844 (S.D. 1985).

[¶123] Because of this order and opinion, the matter of the settlement agreement between NCC and the Trustee should be remanded to Judge Hoyt for further consideration as to whether the settlement should be approved, wholly or in part.

[¶124] Dated this 27th day of December, 2007.

BY THE COURT:

CHARLES B. KORNMANN
United States District Judge

ATTEST:
JOSEPH HAAS, CLERK

BY: _____
                    DEPUTY
         (SEAL)

25